Thank you, Your Honor. I do. Bruce Rogo and Tara Campion for Jonathan and Daniel Markovich. In this case, we're talking about privileged health care documents as the starting point. The government asked for those documents in their prosecution of the Markoviches, and they received them. When the defense asked for the documents regarding health care given to the various witnesses who would be testifying and others who would be subject of government exhibits, Judge Dimitri Laius was very clear. He said, I'm not certain that there's anything here that shows good cause. I'm not certain that there's exculpatory material. I'm not sure whether or not this is just a fishing expedition. And that is the nub of this problem. When a judge is not sure, uncertain about an important aspect of evidence, then the obligation is to dig deeper. And how would one dig deeper here? I recognize the privileged arguments, and I recognize the difficulty sometimes of getting to these records. But what we're talking about and what I'm going to ask the court is for a remand for the inquiry that should be made with regard to whether or not the treatment that the patients received at the other addiction clinics that are not the subject of this prosecution. I just don't understand how, if the government doesn't have those records, they're somehow obliged to seek them for your clients. The government is not necessarily obliged to seek them for our client. I'm not saying that this is more of a baggly kind of situation where there may be something there. And we think there is something there. I don't understand which documents you're talking about. Are you talking about the patient files from third parties? The patient files from other treatment facilities to which they've been. They're called Zen records and Congo audits which involve the payments by insurance companies. And the reason that they're important... Let me just interrupt you so I, if I might for a moment, just so I understand exactly which set of records, these Congo records that the other insurance companies had pertaining to everyone who would have gone into these two clinics? No. Or the witnesses who testified for the government? The witnesses who testified for the government and the files that Dr. Clark, who's a government expert, looked at. She looked at... So just so we're clear. Yes. The government called 15 witnesses. Yes. If I have it right. In addition to that, Clark was given 12 files by the government to take a deep dive into and she randomly selected an equivalent number, she said, of other files. So the totality of the files you're talking about is concerned the 15, probably not all 15, but most of those witnesses, plus the files that Clark looked at. Is that the body of folks we're talking about? The 12 files for sure. What Dr. Clark said, she did say she looked at some others, but she couldn't remember or say who these others were. So our focus is on the 12 files because they were the heart of her testimony. She looked at these files and painted a terrible picture of Compass and War. And so the question then becomes, and the question was asked of her, would it help you if you had the Zen files, if you had the other files, the full files on where these people had been, how they had been treated, the kind of claims they had made about their illnesses then? And she said, yes, yes, it would have helped. But that's all there was. And at that point, of course, the question was raised again by the defense. And once again, Judge Demetriou-Leah said, I've already ruled. And I understand that he ruled. And we're not, what we're saying is, and this is what's interesting about this case, is that all we're saying is, since he was uncertain, uncertain, unsure, and he said also, if it so happens that you get the files and there's something there, there may be a basis for a new trial. He said that. He recognized that. And my argument really focuses on what should a judge do in that situation? Should a judge say, well, I can, maybe there is good cause. I can't know for sure until I see the files, until I get the answer as to whether or not- Let me ask you a question about that. Let's hold aside the examination of Clark. There were witnesses the government called. And if I understood the thrust of the argument, at least pertaining to them, you wanted access to these other files concerning, say, Custora, people like that, because you said it would have provided giglio material. You would have been able to more completely and effectively, perhaps, confront, cross-examine, and show, one, that they were not worthy of belief, and two, their capacity to recall and recount was undermined because they were addicted to drugs for a very extended period of time. That, if I have it right, that's why you wanted access to that other body of records regarding Custora and witnesses like that. Do I have that right? You do. And Custora is the best example of that. Okay. So let me ask you this question. I read the examination and the cross of Custora with much interest. And I have to say, Mr. Pisano very effectively and vigorously cross-examined Custora. Absolutely. I agree. And he established with absolute clarity that Custora lied and lied repeatedly, that he cheated, and that he was strung out on drugs and his capacity to recall and recount was really affected. And he did that, he didn't need the Congo records from these other insurance companies. Would it be fair to say then, at least with regard holding the Clark stuff aside, for these witnesses, what you're asking for at most, at best, if you're right about what was in them, could only have been cumulative, it only would have been more of the same, these folks lied and they were strung out on drugs and they couldn't recall and recount. Isn't that really all you could have done with those? Not quite, but certainly when I read the Custora cross-examination and I said to Mike Pisano, I don't see how you lose this case if this case turns on him, because he was decimated, except obviously he wasn't decimated. A jury believed him. What would have made a difference? Would these records have made a difference? And remember, an important part- These witnesses, this wasn't Sister Teresa testifying here, these were really unattractive witnesses, but nevertheless the corpus of evidence as a whole yielded a conclusion that they were confident about. Well, it's interesting because the corpus of the evidence did show, and I've said this in my brief, that Compass, the way they portrayed it, and war was a place that was like but in terms of Custora and Garnto, who were the star witnesses, there is nothing, there was not one single piece of evidence to show that Jonathan or Daniel, any kind of written evidence that they had done anything. In fact, Custora said, you have to take my word for it. No, I understand that, but if I understood the purpose for getting these records regarding Custora, for example, you wanted to show he was a liar and you wanted to show that his capacity to recall and recount was undermined. I mean, you just, you've been telling lies for years, Mr. Pisano asks, at times. Not just a few lies, a lot of lies, yes. You've been telling lies to get money, yes. Lies to get drugs, yes. Lies to your family, yes. Lies to your friends, yes. Lies it goes on and on and the guy says yes, yes, yes, yes, and yes. What more could you have gotten? And there's one that you weren't fully capable of and did not effectively use. And there's one big lie that could have been the feather that changed everything, and here's the lie. He said that he was clean for nine months and he also, in fact, what's interesting here is he agreed to waive his HIPAA rights and then there was a break in the courtroom. He went out, he came back on the stand, and when he came back on the stand he said, I'm not waiving it. My lawyer had told me I'm not waiving it. What was hidden in there? What could have been in there? That's the point of my argument. We don't know what was in there that could have made a difference. And you know, a feather, could a feather change the outcome of this case? Yes, but in terms of the evidence against them, there is people testify that way about Compass and what their experience was in Compass. But I think the thrust of the question the Chief Judge asked you was, don't you need more than maybe it could have or possibly before you step down this road and establish, remember the government would have to have established good cause, and the district court would have had to weigh the privacy interests, etc. against these other potential concerns. Exactly right, and that's all that I'm asking. More, the opportunity for more. That's the government to do that. It would have had to have been a Brady obligation, right? No, it could have been a Bagley obligation. So reasonable probability that something may have been helpful exculpatory material. It doesn't have to be Brady or Giglio, but what Judge Marcus had just said is really the heart of my case. There needed to be more. He was uncertain. This is a major criminal case. The government put on evidence. The defense has to have the ability to put on their own evidence. I don't know whether or not it would have been exculpatory. None of us know, because the judge did not take the next step. And that's why my request for this court is to remand it for the purpose of bringing the records in, in camera, with all the privacy protections for the patients still there, and let's see what's there. And then instead of saying I'm uncertain, I'm unsure, the judge could make a ruling one way or the other. And by the way, there's a second half of this case, which is the motion for to vacate, which has the same problem. We wanted discovery. We didn't seek to have Judge Demetrio Leyes turn over the convictions. We wanted discovery. That's all. And he wouldn't give us discovery. And there's one little factor in this that to me is astounding. There was a telephone call made, and this is Custura. Custura, who said that he'd been clean for nine months. The night before his testimony, well, the next day, there was a night, there was young Kipper. He testified the next day, and he didn't say anything to anybody about an emergency rescue call, Fort Lauderdale Police, because something happened. What happened? Who did he call? The government says, we use public records. Yes, my time is up. I'll save my three minutes. Ms. Reed. Good morning. May it please the court. Mahogany Reed for the United States. I'll pick up just briefly on the new trial issue that Mr. Rogo closed with and then transition to the Brady Giglio argument. We outline in our brief several independent bases on which this the district court's order denying the defendant's request for post-trial discovery in aid of their new trial motion. I'd like to just respond to the sort of speculative insinuations about the 786 number, that the 786 number belonged to a member of the prosecution team. The government represented below and has represented before this court that the 786 number did not belong to a member of the prosecution team involved in the Markovich's case. You can find the government's representations below at docket 815 page 9. The 786 number cited in the Markovich's motion does not belong to any of the agents assigned to this case. The FBI has searched this phone number in public records systems and has not been able to determine who the number was associated with at the time in question. So I don't know what more the government can represent with respect to the 786 number. We ask that you affirm unless you have other questions about the new trial issue. I'll the insurmountable impediment to the defendant's request for new for other substance abuse treatment records is that they've brought this claim under Brady. And I think the cleanest way to resolve this. The government didn't possess them. That's right, your honor. The government didn't possess the records. You know, I don't think the other side represents that the government actually possessed the records. The other side has represented at times that the government had authority over the holders of the records. I think it's very clear through the regulations through which the government has to apply for the records, show that the requested records contain material evidence, show good cause for the records, and then obtain an order. And even at that point, the holder of the records is not compelled to produce the documents under section 2.61 of the regs. Even if a holder of the records refuses to produce the documents, the government would then have to obtain a subpoena to request them. I think, you know, that the insurance companies responded to the government's request for information and cooperated with the government's investigation under the Ray Eros decision we cite in our brief and that the other side cites in their brief, cooperation does not equal authority. And so, you know, I think it's very clear under Brady case law that the government did not possess the records. I'm happy to discuss the relevance of the documents and materiality of the documents. The government maintains that the documents were not relevant. And so, you know, I'm happy to answer any questions about that. But as I said, I think the cleanest way to resolve the issue is on the question of possession. Just to be clear, were there any medical records of the 12 patients that Dr. Clark relied on that the government had that it didn't turn over to the defense? No, Your Honor. The government provided the defense everything that it had in its possession that pertained to both patients that testified and patients that were the subject of Dr. Clark's report. The government, as we represented below, obtained COMPASS and WAR treatment records. Those were the basis of Dr. Clark's report. The government didn't obtain records from other treatment facilities just because they didn't have any bearing, we believe, on the legal questions at issue, which is how the state of the patients when they presented for treatment at COMPASS and WAR. And so the nature of the treatment they received at other facilities we didn't think was relevant and think was worth Dr. Clark reviewing. Now, Dr. Clark did testify at some point that reviewing the patient's treatment records could be relevant to having a holistic view of the patient's treatment history, but she also testified that the full medical histories wouldn't elucidate the very things that the defendants sought the records for, including whether a patient was med-seeking at other facilities, whether a patient became clean and sober at any point, and if so, whether they obtained sobriety because of their treatment at COMPASS and WAR. And so Dr. Clark didn't think those files were relevant, we didn't think those files were relevant, didn't obtain them, and so that's why we didn't produce them. But everything we had we produced to the defense. Help me with the facts. Dr. Clark, as I understand it, was given the files of 12 people who were treated at these two centers, right? That's right. By the government. That's right. Does the record reflect how those 12 were chosen? My understanding, and I can't recall whether this is clear from the record, but I'm fine representing my understanding that the 12 patients were selected, they were the 12 patients that had a large number of admissions to COMPASS and WAR and were the subject, I believe, of the that the defendants were indicted for. So they bore on the specific counts. That's right. In the indictment. And then she said that she selected at random a similar sum of documents. That's right, your honor. Again, from just relating to the people involved at these two clinics. Yes. And she said it was random. Did she explain how she selected them randomly? By my count, there were like 3,000 in all that I took every 10th one, every 15th or something like that. Or did that come out? The record doesn't contain that information. I don't think she testified to precisely how she selected the additional files. It was just done randomly, random sampling, random pulling from the body of files that she had. Thank you. If there are no further questions, we're happy to submit on our brief for the remaining issues. And we ask that you affirm. Thank you. Thank you. Great. Let me first start with the motion to vacate and the issue of the 786 telephone number. The government has made representations. It's true. And they represented that using public records, they couldn't find whose name the 786 number was in, whose telephone that was. This was a telephone call made at midnight, right after the EMS people had come. And he had had either he was on drugs or he was on alcohol, whatever it was. It would have been a violation of his probation. A day or so later, he testifies he had been clean for nine months. It's an important little point. And again, could it make a difference with a jury or one juror? You know, when I'm talking here, I'm about a different outcome. I'm not necessarily talking about acquittal. I'm talking about a hung jury. I'm talking about what might affect one person on a jury. So the government says they use public records. They couldn't find out whose number 786 was. Well, I don't know why the government can find out all kinds of things with regard to numbers. Relying upon public records struck me as some kind of ability to dodge the real inquiry. If they really wanted to know whose number that was, I'm sure the United States government could have found out whose number that was. Now, let's go to Dr. Clark. We have no idea how she chose other files. We have no idea what the effect would be on the jury when she gives that kind of summary that yes, she randomly chose other files and there was something similar. Of course, you were free to ask and did ask. Well, we did. And the answer she gave was not a specific answer that she chosen in relation to anything, alphabet, whatever it was. There was nothing there. But coming back to really the heart of it, all we're saying is, and this is not a Brady issue the way in a classic Brady sense at all. The government does not have the records. Although they do have, they could have said to the court, yes, we agree that these records should be given. The whole thrust of my argument is a remand. So the uncertainty and the fact that Judge Dimitriles said, if these records do show something, if you get these records and they show something, well, then maybe you'll have grounds for a new trial. And so all we're saying is, let's go to where it should have gone at the beginning. Instead of saying, I'm uncertain, the answer should be, let's find some certainty here before we make an important decision on a fundamental due process issue, the right of defendants to have available evidence that might help them in defending their case. You know, Justice Brennan wrote in 1990 a story about, not a story, but a law review article about there's no discovery in federal criminal cases, no depositions, and asked, is this a sporting event? This trial was a sporting event. The two witnesses, Garnto and Kustura, who had nothing but their own voice to confirm what they said, were the keys to this case, and we never got a chance to get the records that could have changed the outcome. Thank you, Mr. Rogge. We're adjourned for the week.